RECORD NUMBER: 15-2465

# United States Court of Appeals

*for the*

# Fourth Circuit

**PHYLLIS L. DAHL,**

*Plaintiff/Appellant,*

– v. –

**AEROSPACE EMPLOYEES' RETIREMENT PLAN OF THE AEROSPACE CORPORATION; RONALD S. GOETZ; and JULIE C. GOETZ,**

*Defendants/Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

# OPENING BRIEF OF APPELLANT

**BRIAN M. MCCORMACK**
**DUNN, MCCORMACK,**
**MACPHERSON & ORFE**
**3925 University Drive**
**Fairfax, VA 22030**
**(703) 591-6055**

*Counsel for Appellant*

CP  COUNSEL PRESS • VA – (800) 275-0668

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER
ENTITIES WITH A DIRECT FINANCIAL INTEREST IN LITIGATION

Only one form need be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of individual parties as well as corporate parties. Disclosures are required from amicus curiae only if amicus is a corporation. Counsel has a continuing duty to update this information. Please file an original and three copies of this form.

No. 15-2465 Caption: Phyllis Dahl v. Aerospace Employees' Retirement Plan of the Aerospace Corporation, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Phyllis L. Dahl who is the Appellant ,
(name of party/amicus)　　　　　(appellant/appellee/amicus)

makes the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity?
   ☐ YES ☒ NO

2. Does party/amicus have any parent corporations?
   ☐ YES ☒ NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
   ☐ YES ☒ NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
   ☐ YES ☒ NO
   If yes, identify entity and nature of interest:

5. Is party a trade association?
   ☐ YES ☒ NO
   If yes, identify all members of the association, their parent corporations, and any publicly held companies that own 10% or more of a member's stock:

6. If case arises out of a bankruptcy proceeding, identify any trustee and the members of any creditors' committee:

/s/ Brian M. McCormack　　　　　　　　　February 12, 2016
(signature)　　　　　　　　　　　　　　　(date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE ..............................................................2

SUMMARY ARGUMENT ...................................................................6

ARGUMENT ........................................................................................8

    I. STANDARD OF REVIEW ........................................................8

    II. THE PROPERTY SETTLEMENT AGREEMENT AND FINAL
    DECREE OF DIVORCE GAVE MS. DAHL A PROPERTY INTEREST
    IN MR. GOETZ' SURVIVOR BENEFIT PLAN INDEPENDENT OF THE
    EXISTENCE OF A QDRO…………..…..........................................8

    III. THE COMPLAINT ALLEGES FACTS STATING A CAUSE
    OF ACTION FOR FRAUD OR BREACH OF TRUST WITHIN THE
    INTENT OF *FREE v. BLAND* AND *YIATCHOS v. YIATCHOS*.....…….....…10

    IV. THE RELIANCE BY THE APPELLEES AND THE COURT
    BELOW ON *HOPKINS v. AT & T GLOBAL INFORMATION
    SOLUTIONS CO.* IS UNWARRANTED, AS HOPKINS DID NOT
    INVOLVE THE *YIATCHOS* DOCTRINE, NOR, UNLIKE THIS
    CASE, WERE THERE ANY SURVIVOR BENEFIT PLAN
    PROPERTY RIGHTS BELONGING TO MRS. HOPKINS AT
    THE TIME OF HER HUSBAND'S RETIREMENT…………..………..…..19

    V. AS ALLEGED IN THE COMPLAINT, MR. GOETZ'
    MISCONDUCT CAUSED THE PLAN TO REJECT MS.
    DAHL'S DRAFT
    QDRO…………..………………….…………………………………..19

VI. THE AMOUNT OF TIME BETWEEN THE ENTRY OF THE
FINAL DECREE AND THE PRESENTATION OF THE DRAFT
QDRO TO THE AERP IS IRRELEVANT. …………………………….……22

VII. THE DISTRICT COURT'S CONCLUSION THAT IT LACKS
"PRINCIPLES THAT WOULD GUIDE A DISTRICT COURT IN
DETERMINING WHETHER THERE HAS BEEN A FRAUD OR
BREACH OF TRUST" EFFECTIVELY OVERRULES *FREE* AND
*YIATCHOS*………………………………………………..…………..….…25

VIII. THE COMPLAINT SEEKS TO HAVE THE DISTRICT
COURT RESTORE TO MS. DAHL THE RIGHT TO ELECT A
SURVIVOR ANNUITY UNDER MR. GOETZ' PLAN.  GIVEN
THE EQUITABLE PURPOSE OF ERISA, THE EQUITABLE
PURPOSE OF THE RETIREMENT EQUITY ACT OF 1984,
AND THE EQUITABLE REMEDIES REPOSED IN THE
DISTRICT COURT, THE RELIEF SOUGHT IS ENTIRELY
PROPER AND APPROPRIATE.......................................................................27

CONCLUSION AND RELIEF SOUGHT................................................................29

REQUEST FOR ORAL ARGUMENT…………………...………….……..….30

CERTIFICATE OF COMPLIANCE ......................................................................30

CERTIFICATE OF SERVICE …...........................................................................31

# **TABLE OF AUTHORITIES**

**_Case Law_**                                                                                                          **_Page_**

*Edwards v. City of Goldsboro,* 178 F.3d 231 (4th Cir. 1999)…………………............8

*Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*,
    897 F.2d 275 (7th Cir.) (en banc), *cert. denied*, 498 U.S. 820 (1990)……...20, 21

*Free v. Bland*, 369 U.S. 663 (1962)………………………………………….*passim*

*Furlong v. Sanford and als.,* 87 Va. 506, 12 S.E. 1048 (1891)…………………..…..15

*Griffin v. Griffin,* 62 Va. App. 736, 753 S.E.2d 574 (2014)………………………..10, 24

*Hisquierdo v. Hisquierdo*, 439 U.S. 572 (1979)……...…………………………….…17

*Hooters of America Incorporated v. Phillips*,
    173 F.3d 933 (4th Cir. 1999)……………………………………………....18

*Hopkins v. AT & T Global Information Solutions Co.*,
    105 F.3d 153 (4th Cir. 1997)…………………………………………7, 16, 19, 20

*In re Novosielski*, 992 A.2d 89 (Pa. 2010)……………………………………….…14, 15

*Maginnis v. McKenzie*, 13 Bankr. 232 (Bankr. E.D. Va. 1981)…………………..……18

*Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130 (4th Cir. 1993)………....…….……8

*Ridgway v. Ridgway*, 454 U.S. 46 (1981)………………………………….…6, 12, 13, 14, 17

*Sun Life Assurance Company v. Tinsley, et al.*,
    2007 WL 1052485 (W.D. Va.)……………….……………….……8, 15, 16, 27

*Towne v. Towne*, 707 S.W. 2d 745 (Tex. App. 1986)…………..……..……………16, 17

*Trs. of the Dirs. Guild v. Tise*, 234 F.3d 415 (9th Cir. 2000)…………….....9, 22, 23, 24

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535 (4th Cir.1998)…..….......18

*Yiatchos v. Yiatchos,* 376 U.S. 306 (1964)………………………………..…*passim*

## *Constitutional Law*

Article Six, Clause Two, U.S. Constitution ……………………………….……12

## *Statutes*

28 U.S.C. § 1291………………………...…………………………………….…1

29 U.S.C. § 1001………………………………………….……………………28

29 U.S.C. § 1003(a)…………….……………………………………………….28

29 U.S.C. § 1055………...…………………………………………...…..4, 5

29 U.S.C. § 1056……………………………………………………………..21

29 U.S.C. § 1056(d)(1)…………………………………………………..10

29 U.S.C. §1056(d)(3)(B)(i)…………………………………………………..10

29 U.S.C. §1056(d)(3)(B)(ii)………………………………………………11

29 U.S.C. § 1056(d)(3)(G)(ii)……………………………………………21

29 U.S.C. § 1056(d)(3)(H)(i)………………………………………………21

29 U.S.C. § 1132………………………………………….…………………1

29 U.S.C. § 1132(e)(1)…………………………………………...…1, 4, 28

29 U.S.C. §1132(g)(2)(E)………………………………………...……..28

29 U.S.C. § 1144(a)…………………………...…………………………...…….10

29 U.S.C.

§1147(b)(7)…………………..………………………………………………....……10

§ 20-107.3(A)(2), Code of Va…………………………….………………………….9

§ 20-107.3(G)(2), Code of Va…………………………………………………….9

## *Rules of Court*

FRCP 12(b)(6)…………………………………………………...…...5, 6, 8, 19

FRCP 59(e)…………………………………………………..…………….1

## *Other Authorities*

U.S. Department of Labor Regulation 2530.206 (c)(1)………………..…..…….…....8, 22

1984 Committee Report of the House Committee on Ways and Means…………....…..28

JURISDICTIONAL STATEMENT

The District Court's jurisdiction is based upon 29 U.S.C. § 1132(e)(1) of ERISA, because with the exception of actions under subsection (a)(1)(B) of 29 U.S.C. § 1132 of ERISA, United States district courts have exclusive jurisdiction of civil actions brought, as is this action, under subchapter one of ERISA.

This Court has jurisdiction over this appeal as an appeal from a final judgment under 28 U.S.C. § 1291 entered on August 13, 2015. The Appellant filed an FRCP 59(e) motion for reconsideration in the District Court on August 28, 2015 which was resolved by order of the District Court entered October 29, 2015. Appellant timely filed her notice of appeal on November 19, 2015.

STATEMENT OF THE ISSUES

Accepting as true the allegations of the Complaint that:

a. Appellee, Mr. Goetz, and Appellant, Ms. Dahl, agreed in their divorce property settlement agreement that Ms. Dahl had the right to elect the survivor annuity benefit under Mr. Goetz' pension; and

b. The Goetz/Dahl Final Decree of Divorce awarded the survivor annuity election right to Ms. Dahl; and

c. In connection with his application for retirement, Mr. Goetz advised the Aerospace Employees' Retirement Plan (AERP) (the Plan) that there were no orders granting anyone else an interest in his retirement benefits; and

1

d. Mr. Goetz held himself out to the Plan as having the legal right to designate his new wife, Julie Goetz, as his beneficiary; and

e. Mr. Goetz actually entered his current wife's name in the survivor benefit designation section of his retirement application.

Issue  #1 Under the *Yiatchos* doctrine, should such a designation be set aside for fraud or breach of trust when not setting it aside would cause the loss of Ms. Dahl's property right to elect the survivor annuity benefit?

Issue #2  As a matter of law, does fraud or breach of trust enjoy a safe harbor in the case of ERISA survivor annuity beneficiary designations -- a safe harbor not enjoyed in the case of other beneficiary designations such as savings bond beneficiary designations that the Supreme Court in *Free v. Bland* and *Yiatchos* v. *Yiatchos* held could be set aside for fraud or breach of trust?

## STATEMENT OF THE CASE

As alleged in the Complaint, Appellant, Phyllis L. Dahl (Ms. Dahl), was divorced from Appellee, Ronald S. Goetz (Mr. Goetz), by Final Decree of the Circuit Court of Fairfax County, Virginia entered on August 8, 2003. (JA 8, ¶ 8)  Pursuant to a property settlement agreement (PSA) between Dahl and Goetz incorporated into the Final Decree, Ms. Dahl secured the right to elect the survivor annuity benefit under Goetz' Employee Retirement Income Security Act (ERISA) - governed Aerospace Employees' Retirement Plan (AERP). (JA 8, ¶¶ 9, 10) Mr. Goetz remarried, but when

he retired from the Aerospace Corporation in 2014, notwithstanding the requirements of the PSA and the Final Decree, he designated his current spouse, Appellee Julie Goetz, as recipient of his survivor annuity. (JA 11, ¶ 30)  In so doing, he did not advise the Plan that pursuant to the Final Decree, Ms. Dahl had a right of first refusal to elect the survivor annuity for herself.  (JA 11, ¶¶ 30-31) Furthermore, at the time Mr. Goetz wrote in Julie Goetz' name as survivor annuitant in his retirement application, he assured the Plan that there were no Qualified Domestic Relations Orders (QDROs) in place. (JA 12, ¶ 32 and JA 106) The retirement application signed by Mr. Goetz defined "QDRO" as "a court order that assigns part or your entire Plan benefits to your spouse, former spouse, child or other dependent." (JA 105) These misrepresentations by Mr. Goetz frustrated the Plan's efforts, required by statute, to investigate Mr. Goetz' marital history to determine if there were any domestic relations orders (DROs) benefiting a former spouse such as Ms. Dahl, and if there were, to advise Ms. Dahl of the procedure for determining whether the DRO (Final Decree) could be qualified as a QDRO.

When Dahl learned that Goetz had designated Julie as his survivor annuitant, she requested that the Plan recognize her (Dahl's) right to elect the annuity, instead of recognizing the annuity as belonging to Julie.  (JA 10, ¶¶ 22-25) The Plan took the position, and still takes the position, that because the survivor annuity provisions of the Final Decree were not at the time of Mr. Goetz' retirement part of a Qualified

3

Domestic Relations Order (QDRO), under 29 U.S.C. § 1055 of ERISA, the survivor annuity automatically and irrevocably vested in Julie, notwithstanding the fact that the Final Decree awarded the survivor annuity benefit to Ms. Dahl, at her election. (JA 10, ¶ 26 )

When the Plan refused Ms. Dahl's request that it recognize her rights under the Final Decree, she filed her Complaint in the District Court praying that pursuant to 29 U.S.C. § 1132(e)(1) of ERISA, the District Court order the Plan to afford her the right to elect the survivor annuity. (JA 6)  In her Complaint, Dahl argues that the Plan's inflexible application of ERISA effectively transferred her property rights to Julie through fraud or breach of trust perpetrated by Mr. Goetz. (JA  12, ¶ 35) Dahl alleges in her Complaint (as she did throughout the proceedings in the lower court) that the Supreme Court precedents of *Free v. Bland*, 369 U.S. 663 (1962) and *Yiatchos v. Yiatchos,* 376 U.S. 306 (1964) prohibited federal law from being used as a device to defeat her property rights under her PSA with Mr. Goetz and under the Circuit Court's Final Decree. (JA 11, ¶ 27)

Dahl asserted in her Complaint and supporting exhibits that had Goetz informed the Plan of the survivor annuity provisions of the Final Decree, the Plan would have suspended his retirement benefits, thereby preventing the survivor annuity from vesting in Julie, and the AERP would then have awaited the plan administrator's or a

4

court's determination of whether the Final Decree could be considered, or modified to become, a QDRO. (JA 12, ¶ 34 and JA 136)

ERISA has no stated time limit on when a QDRO may be submitted to a retirement plan. (JA 10, ¶ 23) In fact, as alleged in the Complaint, there can be good reason to delay the submission of a QDRO electing a survivor annuity, because until a plan participant's retirement date is known, it is impossible for the alternate payee to gauge the post-retirement actuarial life expectancy of the plan participant, gauge their own post-retirement life expectancy, and in this case, gauge the likely amount of survivor benefit payments Ms. Dahl would receive compared to the premiums she would have to pay during Mr. Goetz' lifetime to qualify for the survivor annuity benefit upon his death. (JA 8-10, ¶¶ 14-20)

The Plan's refusal to recognize the Final Decree's survivor annuity provisions in Dahl's favor is, as stated *supra*, entirely based on the Plan's claim that pursuant to 29 U.S.C. § 1055, the survivor annuity vested in Julie upon the effective date of Mr. Goetz' retirement.

Mr. Goetz and the AERP interposed Rule 12(b)(6) motions against the Complaint, and the District Court found that Dahl had failed to plead a cause of action because:

1. Under the strict application of ERISA, Dahl's rights under the Final Decree were extinguished when Mr. Goetz retired, and the right to the survivor annuity thereupon vested in his current spouse, Julie. (JA 189-190)

2. That Goetz had not engaged in fraud or breach of trust resulting in the vesting, because at the time he told the Plan that there were no orders requiring him to share benefits with anyone else, that statement was true, because a QDRO had not yet been entered. (JA 194, footnote 5) (The District Court did not explain why, in light of the property settlement agreement and the Final Decree, Goetz' representation to the Plan that he had the right to designate Julie as his survivor annuitant was not an independent misrepresentation and/or a breach of trust.)

3. *If* the denial of the annuity to Dahl was the result of Goetz' fraud or breach of trust, it did not matter, because the *Yiatchos* doctrine applies only to fraudulent designations of savings bond beneficiaries, not to fraudulent designations under ERISA. (JA 193)

4. Federal law provides no guidance as to what would constitute fraud under the circumstances alleged, so no relief can be granted to Dahl. (JA 193)

Although the District Court granted the 12(b)(6) motions, the court conceded that Ms. Dahl's arguments represented "a good faith attempt to extend existing law," supported by "persuasive authority"… "albeit unavailing." (JA 260)

## SUMMARY ARGUMENT

Ms. Dahl freely concedes that adhering to the express requirements of federal statutes and regulations is *ordinarily* imperative. That said, it is recognized in *Free v. Bland*, *supra*, *Yiatchos*, *Id*., and *Ridgway v. Ridgway*, 454 U.S. 46 (1981), that where strict adherence to the laws governing beneficiary designations will, because of wrongdoing, defeat a property right, the "regulatory imperative" must be suspended and such wrongful beneficiary designations set aside.

As observed by the Supreme Court in *Free* and *Yiatchos,* a beneficiary designation made pursuant to federal law cannot defeat a property right created under

state law where the designation was wrongful and the strict application of the federal law would both effectuate and shield the wrongful deprivation of the property right.

This Court's precedent in *Hopkins v. AT & T Global Information Solutions Co.*, 105 F.3d 153 (4th Cir. 1997) is not controlling, because the complaint in *Hopkins* did not allege fraud or breach of trust in connection with the beneficiary designation there at issue, much less invoke or even implicate the *Yiatchos* doctrine. Further, the former spouse in *Hopkins*, unlike Ms. Dahl, had no right to a survivor annuity at the time her ex-husband retired.

The District Court agreed that the regulatory imperative must sometimes yield to prevent the frustration of property rights, but was unwilling to conclude that the *Yiatchos* doctrine should be "extended" to ERISA beneficiary designations. (JA 193) Ms. Dahl maintains that under the law, and specifically under the *Yiatchos* doctrine, fraud and breach of trust vitiate every transaction they taint causing injury to property rights, and that there is no immunity from the salutary effects of the doctrine in the case of dishonest designations of beneficiaries under ERISA.

In *Sun Life Assurance Company v. Tinsley, et al.*, 2007 WL 1052485 (W.D. Va.), this Court affirmed a district court's nullification of a fraudulently procured beneficiary designation made in connection with an ERISA-governed Plan.

The District Court's conclusion that it lacked any guidance that would permit it to decide what constituted fraud or breach of trust for the purpose of the *Yiatchos*

doctrine effectively repealed the *Yiatchos* doctrine -- something the District Court plainly had no power to do. *Yiatchos* itself sets forth the standards a district court should apply to determine if fraud or breach of trust has occurred.

Ms. Dahl's Complaint sets forth a viable cause under *Free* and *Yiatchos*, so she deserves an opportunity to prove the allegations of her Complaint and to have her rights restored, if she meets her burden of proof.

<u>ARGUMENT</u>

## I.     STANDARD OF REVIEW

Under well-established precedent, this Court's review of the lower Court's ruling on the Appellees' 12(b)(6) motions to dismiss is a *de novo* review. "We review a district court's dismissal under Rule 12(b)(6) *de novo.*" *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint cannot properly be dismissed on Rule 12(b)(6) motion unless it is impossible for the plaintiff to elicit any facts that would entitle him to the relief he seeks. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-244 (4th Cir. 1999).

## II.    THE PROPERTY SETTLEMENT AGREEMENT AND FINAL DECREE OF DIVORCE GAVE MS. DAHL A PROPERTY INTEREST IN MR. GOETZ' SURVIVOR BENEFIT PLAN INDEPENDENT OF THE EXISTENCE OF A QDRO.

Under §§ 20-107.3(A)(2) and 20-107.3(G)(2), Code of Va., a survivor annuity is marital property, and circuit courts may order a party to a divorce to designate a spouse or former spouse as the beneficiary of the party's survivor annuity. Domestic

8

Relations Orders (DROs), not Qualified Domestic Relations Orders (QDROs), create property rights.  If an alimony decree, for example, is not a QDRO, it doesn't mean the spouse awarded the alimony has no right to receive alimony.  A QDRO is merely the mechanism by which rights created in state domestic relations courts overcome the anti-alienation and preemption provisions of ERISA and become enforceable against ERISA-governed employee benefit plans.  In *Trs. of the Dirs. Guild v. Tise*, 234 F.3d 415, 421 (9th Cir. 2000), the Court said this about how court orders create interests in ERISA pension plans:

> Under this scheme, then, whether an alternate payee has an interest in a participant's pension plan is a matter decided by a state court according to the state's domestic relations law.

The Virginia Court of Appeals has adopted the same analysis as the *Tise* Court:

> The QDRO provisions of ERISA do not suggest that a former spouse has no interest in the plans until she obtains a QDRO, they merely prevent her from enforcing her interest until the QDRO is obtained. *Gendreau v. Gendreau*, 122 F.3d 815, 819 (9th Cir. 1997). A spouse's "interest in the pension plans (or, at a minimum, her right to obtain a QDRO which would in turn give her an interest in the plans) was established under state law at the time of the divorce decree." *Id*. at 818.

*Griffin v. Griffin,* 62 Va. App. 736, 754-755, 753 S.E.2d 574, 583 (2014)

This distinction between DROs that create rights and QDROs that implement rights is important for the purpose of this appeal, because the *Yiatchos* doctrine - which is central to this appeal- is designed to combat "fraud or breach of trust in derogation of …property rights under state law."  *Yiatchos*, *supra*, 376 U.S. at 311

III.   THE COMPLAINT ALLEGES FACTS STATING A CAUSE OF
ACTION FOR FRAUD OR BREACH OF TRUST WITHIN THE
INTENT OF *FREE v. BLAND* AND *YIATCHOS v. YIATCHOS*.

§ 1056(d)(1) of ERISA generally prohibits employees from assigning or

alienating their ERISA-protected employment benefits.  ERIA also generally preempts

state laws relating to employee benefit plans. § 1144(a).  The one exception to these

anti-alienation and preemption provisions is The Retirement Equity Act of 1984

(REA) which amended ERISA to require ERISA-governed employee benefit plans to

recognize and implement State court support and property division orders, including

those approving PSAs:

"Subsection (a) [preemption of state law] of this section shall not apply to qualified

domestic relations orders (within the meaning of section 1056(d)(3)(B)(i) of this title."

29 U.S.C. §1147(b)(7)

§ 1056(d)(3)(B)(i) of ERISA defines a QDRO as:

> A domestic relations order— (I) which creates or recognizes
> the existence of an alternate payee's right to, or assigns to an
> alternate payee the right to, receive all or a portion of the
> benefits payable with respect to a participant under a plan,
> and (II) with respect to which the requirements of
> subparagraphs (C) and (D) are met…

§1056(d)(3)(B)(ii) of ERISA defines a DRO as:

> Any judgment, decree, or order (including approval of a
> property settlement agreement) which— (I) relates to the
> provision of child support, alimony payments, or marital
> property rights to a spouse, former spouse, child, or other
> dependent of a participant, and (II) is made pursuant to a

10

State domestic relations law (including a community
property law).

In *Free v. Bland*, 369 U.S. 663 (1962), the Supreme Court reviewed a clash
between U.S. Treasury regulations that made the surviving (named) joint owner of
U.S. savings bonds the sole and absolute owner of the bonds, and the Texas
community property law that vested spouses with a one-half undivided interest in all
property (including federal savings bonds) purchased with marital community funds.
In *Free*, a husband, using community property, purchased Series E Treasury bonds in
his and his wife's names.  When his wife died, the husband, citing mandatory U.S.
Treasury regulations making a named joint owner on the face of savings bonds the
successor owner on the death of his co-owner, claimed the bonds as his sole property.
The couple's son, who was the executor and principle beneficiary of his mother's
estate, maintained that under Texas law half of the value of the bonds was community
property belonging to his mother, so that upon her death, it became the property of her
estate.  Ultimately, the U.S. Supreme Court held that the Treasury regulations were
federal law, so that under the Supremacy Clause (Article Six, Clause Two, U.S.
Constitution), the Treasury regulations preempted Texas community property law.
Importantly, for the purpose of Ms. Dahl's appeal, the Court also held that:

> The Solicitor General, appearing as amicus curiae, acknowledges that
> there is an exception implicit in the savings bond regulations, including
> the survivorship provision, so that federal bonds will not be a 'sanctuary
> for a wrongdoer's gains.' With this, we agree. The regulations are not
> intended to be a shield for fraud and relief would be available in a case

where the circumstances manifest fraud or a breach of trust tantamount
thereto on the part of a husband while acting in his capacity as manager
of the general community property. However, the doctrine of fraud
applicable under federal law in such a case must be determined on
another day.

"Another day" came quickly in the form of *Yiatchos v. Yiatchos,* 376 U.S. 306
(1964) in which the Court was presented with a twist on *Free v. Bland*. In *Yiatchos*,
as in *Free*, a husband purchased U.S. savings bonds with community property. But
unlike the husband in *Free*, Mr. Yiatchos purchased the bonds solely in his name, and
designated his brother as the survivor beneficiary. When the husband died, his brother
sued to establish his absolute ownership of the bonds under applicable federal
regulations. Yiatchos' widow, however, claimed half the value of the bonds under
Washington community property law. While reaffirming the preemption of state
community property laws by the federal regulations governing savings bonds, the
*Yiatchos* Court also reemphasized its *Free v Brand* (fraud or breach of trust) exception
to the "regulatory imperative." The Yiatchos Court held that in *Free*:

> The Court nevertheless recognized that the federal law was not to be used
> as a shield for fraud or to prevent relief 'where the circumstances
> manifest fraud or a breach of trust tantamount thereto on the part of a
> husband while acting in his capacity as manager of the general
> community property.' 369 U.S., at 670, 82 S.Ct. at 1094.

Seventeen years after *Yiatchos*, in *Ridgway v. Ridgway*, 454 U.S. 46 (1981), the
Supreme Court refused to set aside a life insurance beneficiary designation made
pursuant to the Servicemen's Group Life Insurance (SGLI) Act. In *Ridgway*, Army

12

Sgt. Ridgway was ordered by a Maine divorce court to designate his children as the beneficiaries of his (SGLI) life insurance.  Instead of designating his children, Sgt. Ridgway designated his new wife as the beneficiary of the life insurance. The *Ridgway* Court, cited *Yiatchos,* observing that:  "In *Yiatchos,* the Court considered a question left open in *Free v. Bland,* 369 U.S. at 670-671, namely, the 'scope and application' of the doctrine of fraud as an exception 'to the regulatory imperative.' 376 U.S. at 307."  After citing and describing its ruling in *Yiatchos*, the *Ridgway* Court declined to apply the Court's "exception to the regulatory imperative," because the Court found that the complaint in *Ridgway* "did not involve allegations of fraud or breach of trust," and that under the SGLI Act, Sgt. Ridgway had an absolute right to decide for himself who would be his beneficiary, notwithstanding the Maine court order.  *Ridgway*, 454 U.S. at 59.

By way of contrast, Ms. Dahl's complaint expressly and emphatically alleges fraud and breach of trust by Mr. Goetz. Moreover, unlike Sgt. Ridgway, Mr. Goetz had no right at the time of his retirement to select a beneficiary under the Survivor Benefit Plan, because that election was a marital property right then belonging to Ms. Dahl and recognized as a right under both Virginia law and the Retirement Equity Act of 1984.

Several courts have applied the *Yiatchos* doctrine to set aside tainted beneficiary designations, even when the law made such designations "conclusive."

In the case of *In re Novosielski*, 992 A.2d 89 (Pa., 2010) the Supreme Court of Pennsylvania recognized that the effect of the *Free* and *Yiatchos* doctrine is that a survivorship designation (like Mr. Goetz' designation of his current wife), although regular on its face, is defective if it perpetrates a fraud or breach of trust:

> Case law indicates that the <u>conclusive</u> right of survivorship may be defeated by a showing of fraud or breach of trust. *Yiatchos v. Yiatchos,* 376 U.S. 306, 84 S.Ct. 742, 11 L.Ed.2d 724 (1964); *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962) (both pertaining to regulations that created a right of survivorship in United States savings bonds)."

*Novosielski*, 992 A.2d at 98 (emphasis added)  The import of the *Novosielski* decision is plainly that *any* survivor beneficiary designations procured through fraud (even those described by statute as "conclusive") are void and subject to being set aside under the *Free/ Yiatchos* doctrine.

The soundness of the *Novosielski* ruling is intuitive, because it is absurd to think that Congress does not intend statutes to shield wrongdoing in savings bond cases like *Free* and *Yiatchos*, but (inexplicably) intends statutes to shield wrongdoing in all other areas of federal law.  The Judge in the Court below expressly found that the *Yiatchos* doctrine did not extend to ERISA. (JA 193)  This ruling, in Appellant's view, creates an anomalous "safe harbor" for fraud and breach of trust in an undefined category of cases.  A safe harbor for fraud in ERISA beneficiary designations flouts the maxim that, "Fraud vitiates everything it touches."

> In equity every transfer or conveyance of property, by what means soever
> it is done, is vitiated by fraud…but none of such devices or instruments
> will be permitted by a court of equity to obstruct the requisitions of
> justice.

*Furlong v. Sanford and als.,* 87 Va. 506, 511, 12 S.E. 1048, 1050 (1891)

Consistent with the *Free/Yiatchos* policy of denying "sanctuary to wrongdoers' gains," in *Sun Life Assurance Company v. Tinsley, et al.*, 2007 WL 1052485 (W.D. Va.), a beneficiary designation form for an ERISA-controlled life insurance and pension plan, though regular on its face, was invalidated because procured through fraud. The U.S. District Court for the Western District of Virginia found that a man's "death bed" beneficiary designation under an employer-sponsored ERISA life insurance policy was the product of undue influence by the man's family members. Declaring undue influence a species of fraud (*Id. at* p. 4), the beneficiary designation was voided by Judge Moon. Judge Moon's decision to void the ERISA-governed beneficiary designation in *Sun Life* was affirmed by this Court at 266 Fed. Appx. 228 (2008). Thus, this Circuit did not rely on its *Hopkins v. AT & T Global Information Solutions Co.,* 105 F.3d 153 (C.A.4, 1997) decision so as to shelter the ERISA beneficiary designation in *Sun Life* from avoidance because of fraud. The implication for the case at bar is that the deference shown the ERISA regulatory imperative in *Hopkins* -- a case not involving any allegations of fraud or breach of trust-- is no impediment to challenging ERISA beneficiary designations when they do result from fraud or breach of trust.

15

In a case strikingly similar to this one, *Towne v. Towne*, 707 S.W. 2d 745 (Tex. App. 1986), a man designated his wife as the beneficiary of his Veterans Administration life insurance policy. In the couples' subsequent divorce, the man transferred ownership of the policy to his wife as part of what the couple described in their property settlement agreement as a "fair and just division of the property of the parties." The divorce court approved the Property Settlement Agreement. The husband failed to advise the divorce court and his wife that two months before entering into the property settlement agreement he had changed the policy beneficiary designation from his wife to another woman. When the husband died and the ex-wife attempted to have a constructive trust impressed on the policy death benefits, she was met with a federal preemption argument from the other woman, who claimed that the anti-alienation provisions of 38 U.S.C. § 3101 prevented a constructive trust from attaching to the proceeds of the life insurance policy. The *Towne* Court summarized this argument as:

> Appellant contends that the property settlement agreement which purported to restrict the right of Edwin Towne to change the name of the beneficiary at any time is void under 38 U.S.C. § 3101."

*Id*., at 746-747. The Court proceeded to reject this argument. Relying on *Free* and *Yiatchos*, the Court ruled that whatever rights Congress intended to confer on the husband to name his beneficiary under his VA Life Insurance Policy, he had no right

to manipulate that power to divest his wife of property rights she enjoyed under state law. *Towne*, *Id*. at 748-749

*Free, Yiatchos and Ridgway* demonstrate that when the Supreme Court held that fraud warrants the suspension of the regulatory imperative, it was not referring exclusively to the *tort* of common law fraud. Neither *Free* nor *Yiatchos* involved any misrepresentation of fact to the spouses who were putative victims or fraud or breach of trust. Indeed, there were no allegations of misrepresentation, much less detrimental reliance upon misrepresentation, in *Free* or *Yiatchos*. Instead, in those cases the concern over fraud or breach of trust was for the wrongful manipulation of Treasury regulation to defeat a wife's property interests under state law. In *Hisquierdo v. Hisquierdo*, 439 U.S. 572 (1979), the Court described the problem it had sought to remedy in *Free* and *Yiatchos* as, "The *manipulation problem* that confronted the Court in *Yiatchos v. Yiatchos* and *Free v. Bland*." (emphasis added)

The inclusion of "breach of trust" as a criterion for invoking the *Yiatchos* doctrine indicates that the doctrine is intended to remedy a wide range of wrongdoing, inasmuch as fraud and breach of trust manifest themselves in many forms. "Fraud properly includes all acts, omissions and concealments which involve a breach of legal duty, trust or confidence justly reposed and are injurious to another, or by which an undue and unconscientious advantage is taken of another." *Maginnis v. McKenzie*, 13 Bankr. 232 (Bankr. E.D. Va. 1981).

17

The allegations of the Complaint demonstrate extreme bad faith under circumstances where Mr. Goetz owed Ms. Dahl the opposite - a duty of good faith and fair dealing to effectuate the terms of their PSA. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998). As held in *Hooters of America Incorporated v. Phillips*, 173 F.3d 933, 940 (4th Cir.1999):

> Good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 cmt. a. Bad faith includes the "evasion of the spirit of the bargain…"

By these standards, Mr. Goetz' acts and omissions described in the Complaint were obviously inconsistent with the justified expectations of Ms. Dahl.

Accepting for purposes of this appeal that the factual allegations of the Complaint are true, they describe fraud or, at a minimum, breach of trust by Mr. Goetz entitling Ms. Dahl to the benefit of the *Free* and *Yiatchos* "exception" to the strict application of the "regulatory imperative."

> IV.     THE RELIANCE BY THE APPELLEES AND THE COURT BELOW ON *HOPKINS v. AT & T GLOBAL INFORMATION SOLUTIONS CO.* IS UNWARRANTED, AS HOPKINS DID NOT INVOLVE THE *YIATCHOS* DOCTRINE, NOR, UNLIKE THIS CASE, WERE THERE ANY SURVIVOR BENEFIT PLAN PROPERTY RIGHTS BELONGING TO MRS. HOPKINS AT THE TIME OF HER HUSBAND'S RETIREMENT.

In granting the Appellees' Rule 12(b)(6) motions, the District Court concluded that *Hopkins v. AT & T Global Information Solutions Co.*, 105 F.3d 153 (4th Cir. 1997) compelled dismissal of Ms. Dahl's complaint. (JA 188, 190)  The *Hopkins* precedent, however, does not apply to the particular circumstances of Ms. Dahl's case. First, *Hopkins* is devoid of any allegations that Mr. Hopkins made any attempt to subvert statutes or regulations to turn them into "a shield for fraud" or "a sanctuary for wrongdoing."  Second, at the time of Mr. Hopkin's retirement, his former wife had not been awarded any interest in his survivor benefit plan.  By comparison, at the time of Mr. Goetz' retirement, Ms. Dahl had a right under the PSA and Final Decree of Divorce to elect the survivor annuity for herself.  She held a court-ordered property right recognized under Virginia law and the Retirement Equity Act of 1984. Hence, unlike the ex-wife in *Hopkins*, at the time of Mr. Goetz' retirement, the right to elect the survivor annuity benefit belonged to Ms. Dahl.

> V.  AS ALLEGED IN THE COMPLAINT, MR. GOETZ'
> MISCONDUCT CAUSED THE PLAN TO REJECT MS. DAHL'S
> DRAFT QDRO.

The Complaint identifies the reason the AERP will not recognize Ms. Dahl's right of first refusal of the survivor annuity benefit.   In short, the AERP won't recognize Ms. Dahl's claim to the survivor annuity because the AERP maintains that when Mr. Goetz retired, before a survivor annuity QDRO had been presented to the Plan, the annuity vested in Julie Goetz. (JA 10, ¶¶ 24, 25, 26)

19

As is clear from the Complaint (and has never been disputed by the Plan Administrator) the only impediment to Ms. Dahl receiving a survivor annuity under the Plan is that Mr. Goetz chose to retire and designate his current spouse as his survivor annuitant without notifying Ms. Dahl of his imminent retirement and after purposefully misrepresenting to the Plan that there were no court orders affecting the disposition of the survivor annuity benefit and misrepresenting to the Plan, by his designation of Julie as his survivor annuity beneficiary, that he had the legal right to do so.

In *Hopkins*, this Court cited with approval *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275 (7th Cir.) (en banc), *cert. denied*, 498 U.S. 820 (1990). The *Fox Valley* Court recognized that:

> Under the ERISA statutory scheme, a plan administrator must investigate the marital history of a participant and determine whether any domestic relations orders exist that could affect the distribution of benefits… Our decision only requires plan administrators to continue their current practice of thoroughly investigating the marital status of a participant.

The Court in *Fox Valley* was no doubt referring to the provisions of § 1056 of ERISA requiring plans to determine whether DROs exist that may qualify as QDROs for purposes of plan administration. § 1056(d)(3)(G)(ii) of ERISA require pension plans to notify alternate payees such as Ms. Dahl of the procedure for determining whether a DRO may be deemed a QDRO:

> (ii) Each plan shall establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Such procedures—
> (I) shall be in writing,
> (II) shall provide for the notification of each person specified in a domestic relations order as entitled to payment of benefits under the plan (at the address included in the domestic relations order) of such procedures promptly upon receipt by the plan of the domestic relations order…

During the period that the qualified status of DRO's are under review by a plan or a court, the payment of benefits to the plan participant are decreased and "sequestered" to account for the alternate payee's interest in the benefits should the DRO under review be determined to be a QDRO. § 1056(d)(3)(H)(i) provides:

> (i) During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts (hereinafter in this subparagraph referred to as the "segregated amounts") which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.

Given these provisions of ERISA, and the allegations of the Complaint, a strong inference should be drawn that had Mr. Goetz not denied the existence of the survivor annuity provisions of the Final Decree at the time he submitted his written retirement application. Or, had he told the AERP that he could not complete the survivor annuity designation section of his retirement application because Ms. Dahl had the court-ordered right to make that election, the Plan would have notified Ms. Dahl in writing

of the procedure for submitting a QDRO, thereby preventing the survivor annuity

benefit from ever vesting in Julie Goetz.

### VI.  THE AMOUNT OF TIME BETWEEN ENTRY OF THE FINAL DECREE AND THE PRESENTATION OF THE DRAFT QDRO TO THE AERP IS IRRELEVANT.

The District Court commented in its Memorandum Opinion that Ms. Dahl had

waited 11 years to submit a QDRO. (JA 194-195)  While true, that fact is irrelevant.

As recited in the Complaint (JA 10, ¶ 23),"Under U.S. Department of Labor

Regulation 2530.206 (c)(1), "[A] DRO [Domestic Relations Order] does not fail to

satisfy QDRO requirements solely because of the time at which the order is issued by

a court or received by a plan."  Further, "Because a QDRO only renders enforceable

an already existing interest, there is no conceptual reason why a QDRO must be

obtained before the plan participant's benefits become payable on account of his

retirement or death." *Tise*, 234 F.3d at 421.  The *Tise* Court observed that ERISA

provides for the segregation of benefits payable to a putative alternate payee while a

draft QDRO is being reviewed by a plan to determine its status as a QDRO:

> [ERISA] specifically provides for situations in which no valid QDRO
> issues until after benefits become payable. Once the pension plan is on
> notice that a domestic relations order has issued that may be a QDRO, the
> plan may take a reasonable period to determine whether the order is a
> QDRO and therefore creates obligations for the pension plan. 29 U.S.C.
> S 1056(d)(3)(G)(II). While the plan is making this determination, it must
> segregate the benefits that would be due to the alternate payee under the
> terms of the DRO during the first 18 months that those benefits would be
> payable if the DRO is ultimately deemed a QDRO. 29 U.S.C.

§ 1056(d)(3)(H)(v). This benefits segregation requirement obviously
assumes that benefits may already be payable during the period the plan
is determining whether the DRO is a QDRO.

*Tise*, *supra* at 421. Extending this reasoning, the *Tise* Court also concluded that it was

not the intent of Congress that the rights of an alternate payee be terminated because

of events, such as a participant's retirement, occurring before a plan could determine

whether a draft QDRO met the technical requirements of a QDRO:

> Third, Congress expressly contemplated that further state court
> proceedings might ensue during the 18-month QDRO-determination
> period, through which the alternate payee could attempt to cure any
> defects in the original DRO and obtain an enforceable QDRO… [T]he
> evident purpose of the 18-month period was to provide a time in which
> any defect in the original DRO could be cured. The statute therefore
> provides that the alternate payee may, within the 18-month period,
> present the plan administrator, in lieu of the original court order, with a
> "modification thereof." 29 U.S.C. §1056(d) (3)(H)(ii). If the plan
> administrator determines before the expiration of the 18-month fund
> segregation period that the modified court order is a valid QDRO, the
> alternate payee is entitled to payment of benefits. Id.

*Id*. at 422.  The Court explained that ERISA anticipates and provides for the

circumstance in which a DRO is obtained by an alternate payee, but not submitted

until after the event that triggers the payment of benefits to a plan participant:

> This complex, carefully articulated statutory scheme, then, plainly
> contemplates, and accounts in detail for, the situation in which the event
> that triggers the payment of benefits occurs before the plan knows
> whether it will be obliged to make payments to an alternate payee. As
> such, the statute necessarily permits an alternate payee who has obtained
> a state law DRO before the plan participant's retirement, death, or other
> benefit-triggering event to perfect the DRO into a QDRO thereafter
> (subject to the 18-month period after which any previously-due benefits
> are payable to the original beneficiary).

*Griffin v. Griffin*, *supra,* 753 S.E.2d at 586, echoes *Tise* in this regard: "Moreover,

ERISA contemplates situations where a benefit becomes payable, but a court or the

plan administrator takes months to determine if a DRO qualifies as a QDRO." The

AERP's own "Guidelines" (JA 136) provide for situations where a participant's

benefits are suspended while a DRO or revised DRO is under review by the Plan

Administrator or a court:

> Suspension of Benefits upon Receipt of DRO.  Promptly after
> receipt of a DRO (including a revised DRO that has been submitted after
> the Administrator has determined that a previously submitted DRO is not
> a QDRO), the Administrator will notify the Plan's trustee of the receipt
> of the DRO and will account separately for the amount of the
> participant's right to receive any distribution under the Plan to the extent
> the Administrator deems necessary to comply with the DRO.  This
> "hold" on the payment of a participant's benefits shall remain in place
> until the status of the DRO as a QDRO is finally determined (by the
> Administrator, the court, otherwise)…

The Complaint also contains allegations explaining why it was prudent for Ms.

Dahl to delay the submission of a QDRO until Mr. Goetz retired. (JA 8-10, ¶¶ 14-20)

Ms. Dahl and Mr. Goetz each agreed to assume payment responsibility for the

premiums that would be charged by the AERP for each of them to receive a survivor

annuity under the other's plan. (JA 8, ¶ 14)  But until Mr. Goetz' retirement, there was

no way for Ms. Dahl to know what her and Mr. Goetz' actuarial life expectancies

would be from the time of Mr. Goetz' retirement.  This uncertainty made it

impossible, before Mr. Goetz' retirement, to calculate the amount and duration of

survivor annuity payments Ms. Dahl was likely to receive compared to the amount and duration of the increased premium payments she would have to make if she opted for the survivor annuity.  Thus, whether to exercise her right to a survivor annuity, and what percentage to elect, could not be an informed decision until the relevant actuarial data coalesced upon Mr. Goetz' retirement. Ms. Dahl's submission of a QDRO to the AERP without knowing Mr. Goetz' retirement date would have been a leap in the dark, and perhaps, a very expensive leap.  Indeed, it was not until 2015, after his retirement, that Mr. Goetz submitted *his* draft QDRO to the AERP, so he can be paid benefits from *Ms. Dahl's* retirement plan.

Further, if the Appellants, without specifically saying so, maintain that the Complaint shows that Ms. Dahl waived her right to the survivor annuity, then they are asserting the affirmative defense of a knowing and voluntary waiver which they have the burden of proving at trial.  FRCP 8(c);  *Melanson v. Browning-Ferris Industries, Inc.*, 281 F.3d 272, 276 (1st Cir., 2002).

> VII.  THE DISTRICT COURT'S CONCLUSION THAT IT LACKS "PRINCIPLES THAT WOULD GUIDE A DISTRICT COURT IN DETERMINING WHETHER THERE HAS BEEN A FRAUD OR BREACH OF TRUST" EFFECTIVELY OVERRULES *YIATCHOS*.

One reason given by the Court below for concluding that Ms. Dahl had not stated a cause of action in her Complaint was that:

> Additionally, even if the Court were to find that *Free* and *Yiatchos* could be extended to ERISA, Ms. Dahl has cited no case law delineating the scope of the fraud exception.  *Yiatchos* remanded the case to develop a

factual record on a narrow question.  It did not set forth principles that would guide a district court in determining whether there has been a fraud or breach of trust in a different factual scenario.

(JA 193) To the contrary, in *Yiatchos,* the Supreme Court identified the law to be applied to determine if a beneficiary designation pursuant to federal law should be set aside for fraud or breach of trust:

> Under the federal regulations petitioner is entitled to the bonds unless his deceased brother committed fraud or breach of trust tantamount to fraud. Since the construction and application of a federal regulation having the force of law, *California Comm'n v. United States*, 355 U.S. 534, 542 - 545; *Standard Oil Co. v. Johnson,* 316 U.S. 481, 484 , are involved, whether or not there is fraud which will bar the named beneficiary in a particular case must be determined as a matter of federal law, *Free v. Bland*, supra; *Clearfield Trust Co. v. United States*, 318 U.S. 363 . But in applying the federal standard we shall be guided by state law insofar as the property interests of the widow created by state law are concerned. It would seem obvious that the bonds may not be used as a device to deprive the widow of property rights which she enjoys under Washington law and which would not be transferable by her husband but for the survivorship provisions of the federal bonds.

*Yiatchos*, 376 U.S. at 309.

Hence, the *Yiatchos* Court plainly held that whether a beneficiary designation made pursuant to federal regulations is void for fraud is a question of federal law informed by the state law defining the property rights of the party allegedly defrauded. Thus, the *Yiatchos* Court provided district courts with instructions on how to determine in a particular case whether there has been fraud or breach of trust.  The District Court implies that there is a type of fraud or breach of trust that vitiates

beneficiary designations under Treasury regulations, but another enigmatic kind of fraud or breach of trust that *doesn't* vitiate beneficiary designations under ERISA.

In vivid contrast to the analysis made by the Court below, in *Sun Life*, *supra*, Judge Moon addressed head-on the issue of what law to apply to determine whether an ERISA beneficiary designation should be set aside for fraud. He concluded that, "[t]he federal common law of undue influence …announced in *Tinsley v. General Motors Corp*., 227 F.3d 700, 704 (6th Cir. 2000) was suitable for national application as an expression of the federal common law of fraud." As stated *supra*, his decision was affirmed by this Court at 266 Fed. Appx. 228 (2008).

Additionally, the elements of fraud are so well established and uniform throughout the nation that application of the common law of fraud to this case would not contradict nor otherwise impede the objectives of federal law.

> VIII. THE COMPLAINT SEEKS TO HAVE THE DISTRICT COURT RESTORE TO MS. DAHL THE RIGHT TO ELECT A SURVIVOR ANNUITY UNDER MR. GOETZ' PLAN. GIVEN THE EQUITABLE PURPOSE OF ERISA, THE EQUITABLE PURPOSE OF THE RETIREMENT EQUITY ACT OF 1984, AND THE EQUITABLE REMEDIES REPOSED IN THE DISTRICT COURT, THE RELIEF SOUGHT IS ENTIRELY PROPER AND APPROPRIATE.

29 U.S.C. § 1001, "Congressional findings and declaration of policy," declares the legislative objectives of ERISA:

> [I]t is . . . desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided assuring the equitable character of such plans and their financial soundness.

(emphasis added) A 1984 Committee Report of the House Committee on Ways and Means described the purpose of the Retirement Equity Act of 1984 as being "to provide for greater equity under private pension plans for workers and their spouses." (emphasis added)

For §1132(e)(1) appeals (such as Ms. Dahl's appeal to the District Court to overrule the Plan Administrator's decision), Congress has reposed in district courts the power to grant "such other legal or equitable relief as the court deems appropriate." §1132(g)(2)(E) (emphasis added) What these passages distinctly illustrate is the strong desire of Congress that ERISA produce equitable outcomes. The position in which Ms. Dahl currently finds herself is anything but equitable. She agreed that Mr. Goetz would enjoy a survivor benefit option under her retirement plan and Mr. Goetz agreed that Ms. Dahl would enjoy a survivor benefit option under his retirement plan. As set forth in the Complaint, Mr. Goetz now enjoys AERP survivor benefits under Ms. Dahl's plan, but the AERP has denied reciprocal rights to Ms. Dahl. ¶ 26 of the Complaint explains the AERP's reason for denying the survivor benefit to Ms. Dahl. The explanation given by the AERP, stated differently, is that Ms. Dahl has lost her rights because Mr. Goetz (hiding the PSA and Final Decree) gulled the Retirement Office into letting him retire before the discovery of Ms. Dahl's property interest in the survivor annuity. When Congress announced that the purpose of ERISA and the REA was to bring equity to pension plans, it could not possibly

28

have intended this outcome.  The *Yiatchos* doctrine exists precisely to remedy such inequitable results.

## CONCLUSION AND RELIEF SOUGHT

To say, as do the Appellees, that Ms. Dahl's lack of a QDRO, *per se*, defeats her right to a survivor annuity, without asking whether fraud or breach of trust explain her lack of a QDRO, abrogates the *Yiatchos* doctrine's "exception" to the regulatory imperative and debases the law by making it a "shield for fraud" and a "sanctuary for wrongdoing."  The *Yiatchos* Court made clear that the exception it recognized to the regulatory imperative was to protect property rights.  Under the *Yiatchos* doctrine, Ms. Dahl's property rights are also entitled to protection.

Ms. Dahl respectfully requests that the order dismissing her Complaint be reversed and the case remanded to the District Court for trial.

## REQUEST FOR ORAL ARGUMENT

Appellant requests oral argument.


PHYLLIS L. DAHL
By Counsel

29

DUNN, McCORMACK & MacPHERSON
3925 University Drive
Fairfax, VA 22030
(703) 591-6055
Fax (703) 591-5151

By:    /s/ Brian M. McCormack
       Brian M. McCormack
       VSB # 012647
       Counsel for Appellant,
       Phyllis L. Dahl


## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,655 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word (2010) Times New Roman font in 14 point font size.


                                  /s/ Brian M. McCormack
                                  Brian M. McCormack

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 12, 2016, the foregoing was electronically filed with the Fourth Circuit Court of Appeals using CM/EFC. I also certify that the foregoing document is being served this day to all counsel of record via transmission of Notices of Electronic Filing generated by CM/EFC.


By: /s/ Brian M. McCormack
Brian M. McCormack